**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

UNITED STATES OF AMERICA

v.

ANTHONY VETRI

CRIMINAL ACTION
NO. 15-157-2

**PAPPERT, J.**                                                     **December 5, 2022**

### MEMORANDUM

Anthony Vetri was charged with conspiring to distribute Oxycodone and ordering the murder of a fellow distributor, Gbolahan "Bo" Olabode, to increase his share of pills from their common supplier. Vetri's lawyer, Fortunato Perri Jr., filed and argued several pretrial motions and effectively represented Vetri in all pretrial matters. Vetri also retained Peter Scuderi, who withdrew twelve days after entering his appearance when the Government moved to disqualify him based on a conflict of interest—namely, that he was simultaneously representing two Government witnesses.

Perri tried the case, but his experience and zealous advocacy could not overcome the Government's overwhelming evidence of Vetri's guilt, and the jury convicted him on both counts. The Court sentenced Vetri to 240 months' imprisonment on the conspiracy count and a consecutive life term for the murder. Vetri now seeks to challenge his sentence, raising a number of claims regarding many aspects of counsel's performance.

No evidentiary hearing was needed to resolve claims one and four through sixteen because they are a hodgepodge of speculative assertions and wild theories about what counsel could or should have done, untethered to the voluminous evidence the Government presented to show what really happened. The assertions are unsupported

1

and in many instances contradicted by the trial record or pertain to issues the Court already decided.

Some of the claims are specious accusations against the prosecutors, such as the "Supplemental" Petition that declares a key Government witness, Michael Mangold, has "fallen from the face of the earth," which to Vetri "suggests that there may have been a secret deal" with Mangold that the Government hid from the defense at trial. Even this theory is outdone by the whimsical argument that had Perri not "scared" Vetri out of taking the stand in his defense he would have testified and cleared up the myriad "misunderstandings" created by the Government's prolific proof. But when questioned by his attorney, Vetri testified that he made the decision, of his own free will and without any force or threats, not to testify.

In an abundance of caution, the Court held an evidentiary hearing on claims two and three, and those claims were shown to be meritless as well. Perri, Scuderi and Vetri all testified. Perri and Scuderi credibly explained their roles in Vetri's representation, with Scuderi describing how he prepared initial drafts of certain pretrial filings and Perri discussing his role as lead trial counsel and final decisionmaker on all strategic matters, including which pretrial motions to file and in what final form. Vetri's testimony, by contrast, was internally inconsistent, at odds with previous filings, and plainly not credible. After considering the parties' submissions, testimony, and post-hearing findings of fact and conclusions of law, Vetri failed to meet his burden on these claims, too.

The Court denies Vetri's Petition in its entirety and closes this case without issuing a certificate of appealability.

I

On May 31, 2017, the Grand Jury returned a second superseding indictment charging Vetri in count one with conspiracy to distribute Oxycodone in violation of 21 U.S.C. § 846 and in count six with murder in the course of carrying and using a firearm during and in relation to a drug trafficking crime in violation of 18 U.S.C. § 924(j)(1) and aiding and abetting in violation of 18 U.S.C. § 2.  (ECF 82.)[1]  Perri, who has an extensive criminal practice and more than thirty years of trial experience, entered his appearance as counsel for Vetri.  (ECF 102.)  Scuderi subsequently appeared as well but a conflict of interest forced him to withdraw less than two weeks later.  *See infra* Section III.B.

With Perri representing him, Vetri proceeded to trial on November 29, 2017. Perri effectively cross-examined the Government's witnesses, including the two Scuderi represented, and contended in his opening statement and closing argument that Vetri withdrew from the conspiracy before the limitations period.  (Trial Tr. Day 2 at 38:8–48:5, ECF 202); (Trial Tr. Day 7 at 34:12–53:9, ECF 207).  But the jury convicted Vetri on both counts.  (Verdict Sheet, ECF 190.)

With different lawyers now representing him, Vetri moved for acquittal, a new trial and to arrest judgment, and later supplemented the motion.  (ECF 196, 244.)  The Court denied both motions, concluding the Government presented overwhelming evidence of Vetri's guilt.  (May 30, 2018 Mem 8, ECF 251.)  It also reaffirmed its decisions on several pretrial matters, including Vetri's motions to sever his trial, suppress evidence recovered from his cell phone and continuance request, and the

---

[1]      The Court presented this case's facts in detail in its May 30, 2018 memorandum.  (ECF 251 Part I.)

Government's motion to introduce prior bad acts evidence. (*Id.* at 16–17.) The Court considered briefing, oral argument or both on these matters, and issued three opinions explaining its decisions. (ECF 107, 109, 111, 117, 125, 127, 131, 140, 143, 147, 154, 161, 171, 175.)

On June 5, 2018, the Court sentenced Vetri to 240 months' imprisonment on count one and a consecutive life term on count six. (Judgment 2, ECF 256.) Vetri appealed his convictions and sentence, and the Third Circuit affirmed. (Not. of Appeal, ECF 267; Third Circuit Mandate, ECF 322.)

On November 8, 2021, Vetri moved to vacate, set aside or correct sentence pursuant to 28 U.S.C. § 2255 and subsequently supplemented his Petition. (ECF 362, 378.) Vetri alleges, in claims one through sixteen:

(1) Perri provided ineffective assistance of counsel by not presenting a viable defense or calling Vetri to testify;

(2) Scuderi's simultaneous representation of Vetri and two Government witnesses created an actual conflict of interest;

(3) Perri provided ineffective assistance by allowing Scuderi to represent Vetri despite the alleged conflict;

(4) Perri was ineffective for failing to move to exclude certain evidence before trial;

(5) Perri was ineffective for not successfully rebutting the Government's case against Vetri on the murder count;

(6) Perri was ineffective for failing to request a continuance;

(7) Perri was ineffective because he inadequately cross-examined certain witnesses with respect to select issues;

(8) Perri was ineffective for failing to present alternative theories as to the murderer's identity;

(9) the Government committed *Brady* and/or Jencks Act violations by
   failing to give Vetri a witness's statement;

(10) Perri was ineffective for not objecting to certain testimony and
    inadequately impeaching a certain witness;

(11) the Government violated the Supreme Court's decisions in *Brady* and
    *Napue* and the Third Circuit's decision in *Haskell* by failing to disclose
    certain records or correct certain testimony at trial, or in the
    alternative Perri was ineffective for not obtaining these records and
    impeaching this testimony;

(12) the Government violated *Haskell* by allowing a witness to give false
    testimony at trial, or in the alternative Perri was ineffective for not
    objecting to or rebutting this testimony;

(13) Perri was ineffective for not cross-examining a certain witness
    regarding his motive for testifying against Vetri;

(14) Perri was ineffective for not presenting testimony on Vetri's "good"
    character;

(15) the Government potentially violated *Brady* by not disclosing a "secret
    deal" between it and a witness; and

(16) these violations cumulatively prejudiced Vetri.

(Pet.; Pet. Supp.)  The Court ordered supplemental briefing on claims two and three

and subsequently held an evidentiary hearing on these claims.  (*Id.* at 15); (July 14,

2022 Order, ECF 390; November 1, 2022 Hearing Tr., ECF 422.)

II

A

Section 2255(a) of Title 28 of the United States Code permits a prisoner serving a

federal sentence to move the sentencing court to vacate, set aside, or correct his

sentence when (1) the sentence violated the Constitution or federal law; (2) the court

lacked jurisdiction to impose the sentence; (3) the sentence exceeded the maximum

authorized by law; or (4) the sentence is otherwise subject to collateral attack.  The

5

petitioner bears the burden of showing his § 2255 petition has merit and must clear a significantly higher hurdle than on direct appeal.  *See United States v. Davies*, 394 F.3d 182, 189 (3d Cir. 2005); *United States v. Cleary*, 46 F.3d 307, 310 (3d Cir. 1995).

The court must hold an evidentiary hearing for a § 2255 petition unless the motion, case filings and record conclusively show the prisoner is not entitled to relief. 28 U.S.C. § 2255(b).  Put another way, if a petitioner alleges facts that are not clearly resolved by the record, the court is statutorily obligated to hold a hearing.  *United States v. McCoy*, 410 F.3d 124, 134 (3d Cir. 2005).  When considering a § 2255 motion, a court must accept the truth of petitioner's factual allegations unless they are clearly frivolous based on the record.  *Gov't of Virgin Islands v. Forte*, 865 F.2d 59, 62 (3d Cir. 1989).

B

The Sixth Amendment guarantees a criminal defendant the right to the effective assistance of counsel, and counsel can deprive a defendant of this right by failing to render adequate legal assistance.  *Strickland v. Washington*, 466 U.S. 668, 686 (1984). To prevail on an ineffective assistance claim, the petitioner must show (1) counsel provided deficient performance and (2) this deficiency prejudiced his defense.  *Id.* at 687.  A court can analyze these prongs in any order and need not address both if petitioner makes an insufficient showing on one.  *Id.* at 697; *Gaines v. Superintendent Benner Twp. SCI*, 33 F.4th 705, 712 (3d Cir. 2022).  *Strickland*'s two-part test is a high bar to surmount.  *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010).

The standard for attorney performance is objective reasonableness under prevailing professional norms when considering all the circumstances.  *Strickland*, 466

U.S. at 687–88, 690; *Vickers v. Superintendent Graterford SCI*, 858 F.3d 841, 850 (3d Cir. 2017).  Judicial review of counsel's performance is highly deferential.  *Strickland*, 466 U.S. at 689.  The court cannot be distorted by hindsight, must evaluate counsel's conduct from his perspective at the time and strongly presume his conduct is in the wide range of reasonable assistance.  *Id.*; *United States v. Scripps*, 961 F.3d 626, 632 (3d Cir. 2020).

Counsel's strategic decisions—such as whether to object to or cross-examine witnesses or how to rebut a closing argument—are strongly presumed reasonable and, if so, "virtually unchallengeable." *Dunn v. Reeves*, 141 S.Ct. 2405, 2410 (2021) (per curiam); *Strickland*, 466 U.S. at 689–91.  Likewise, counsel must have wide latitude for his tactical choices, to which courts are highly deferential.  *Strickland*, 466 U.S. at 689; *Marshall v. Hendricks*, 307 F.3d 36, 85 (3d Cir. 2002).

As for prejudice, the petitioner must show a reasonable probability that, but for counsel's errors, the proceeding's result would have been different, and the likelihood of a different result must be substantial, not merely conceivable.  *Strickland*, 466 U.S. at 694; *Harrington v. Richter*, 562 U.S. 86, 112 (2011).  A reasonable probability is one that undermines confidence in the outcome.  *Id.*

### C

The Sixth Amendment also guarantees criminal defendants the right to counsel free of conflicts of interest.  *Wood v. Georgia*, 450 U.S. 261, 271 (1981).  To prove this right was violated, a criminal defendant must show (1) an actual conflict (2) adversely affected his lawyer's performance.  *Cuyler v. Sullivan*, 446 U.S. 335, 348 (1980). Prejudice is presumed if the defendant demonstrates both elements.  *Id.* at 349–50.

An actual conflict occurs if the interests of counsel's clients diverge regarding a course of action or material legal or factual issue. *United States v. Morelli*, 169 F.3d 798, 810 (3d Cir. 1999). Such conflicts can arise at trial or in the "murkier" pre-trial context. *Wheat v. United States*, 486 U.S. 153, 162 (1988). One potential example is when, as here, a lawyer simultaneously represents a criminal defendant and cooperating government witness. *See United States v. Bellille*, 962 F.3d 731, 743 (3d Cir. 2020). The mere possibility of a conflict or theoretical division of loyalties, however, are insufficient. *Gov't of Virgin Islands v. Zepp*, 748 F.2d 125, 135 (3d Cir. 1984); *Mickens v. Taylor*, 535 U.S. 162, 171 (2002).

To demonstrate adverse effect, the criminal defendant must show an actual lapse in counsel's representation contrary to the defendant's interests. *Sullivan v. Cuyler*, 723 F.2d 1077, 1086 (3d Cir. 1983); *see also Burger v. Kemp*, 483 U.S. 776, 783 (1987). The defendant can rely on what counsel did or failed to do. *See Holloway v. Arkansas*, 435 U.S. 475, 489–90 (1978). Either way, the defendant must show a plausible alternative strategy or argument might have been pursued that was inherently in conflict with or not undertaken because of the lawyer's other loyalties or interests. *United States v. Gambino*, 864 F.2d 1064, 1070 (3d Cir. 1988). This alternative option need not have been successful—only viable. *Simon v. Gov't of Virgin Islands*, 929 F.3d 118, 130 (3d Cir. 2019).

### III

Vetri is not entitled to relief on any of his claims. He cannot show deficient performance, prejudice or both for any of his ineffective assistance claims. As to Vetri's actual conflict claims, Scuderi's simultaneous representation of Vetri and two

Government witnesses before trial did not adversely affect Vetri's representation.  Vetri also can't show the Government violated its constitutional disclosure obligations or knowingly used false testimony at trial.

A

1

Vetri contends in claim one that Perri failed to present an affirmative defense that Vetri withdrew from the conspiracy, specifically by failing to put Vetri on the stand to contradict the Government's evidence to the contrary.  (Pet. 6.)

Perri's strategic decisions about how to argue Vetri's purported withdrawal were reasonable and are entitled a high degree of deference.  *See Strickland*, 466 U.S. at 689–91.  Moreover, Vetri's contention that Perri's "execution" of his "gameplan" was flawed is at odds with the trial record.  (Pet.'s Reply 1, ECF 382.)  Perri argued in his opening statement and closing argument that Vetri withdrew from the conspiracy before the limitations period.  (Trial Tr. Day 2 at 38:8–48:5; Trial Tr. Day 7 at 34:12–53:9.)  He cross-examined multiple witnesses, including Angelo Perone—one of Vetri's distributors and close friends—about the timing of Vetri's Oxycodone distribution in an attempt to cast doubt on his continued involvement in the conspiracy.  (Trial Tr. Day 3 at 262:12–263:2, ECF 203); *see also* (Trial Tr. Day 5 at 243:2–5 (cross-examination of Maratea), ECF 205; Trial Tr. Day 4 at 203:5–204:20 (Mitesh Patel, Vetri's Oxycodone supplier), ECF 204.  That the jury nonetheless convicted Vetri on count one does not suggest Perri's performance was deficient.[2]

---

[2]     Vetri submitted a declaration from a retired DEA investigator concluding, based on his interpretation of trial exhibits and testimony, that Vetri's Oxycodone distribution ended before the limitations period.  (Pet.'s Reply Ex. C.)  The jury concluded otherwise based on ample supporting evidence.  In addition, *Smith v. United States*, 568 U.S. 106 (2013), cited by Vetri, is inapt.  (Pet.'s

9

2

Vetri argues Perri should have called him to testify about a number of issues—

specifically:

(1) Vetri withdrew from the conspiracy outside of the limitations period,
    "critical" testimony to this defense given only he could have provided it;

(2)  Vetri was not involved in Oxycodone sales within the limitations period that
    Patel testified Vetri made;

(3) Patel's text messages to Vetri in that period did not actually ask him to
    deposit money into Patel's bank account as payment for Oxycodone;

(4) why Michael Vandergrift, one of Olabode's two shooters, and his girlfriend
    were living at a home in Chester, Pennsylvania owned by Vetri into 2013;

(5) Vetri was not involved in a burglary he ordered to obtain one of the firearms
    used to kill Olabode;

(6) Vetri had concealed carry licenses in many states and multiple firearms and
    thus didn't need anyone to obtain a murder weapon;

(7) Eric Maratea, one of Vetri's close friends, falsely testified that while in his
    bedroom Vetri said he ordered Olabode's murder, and Maratea had a motive
    to implicate Vetri; and

(8) there was a "very innocent" explanation for the video of Vetri's toddler
    daughter saying the "gangsters" did "boom, boom, boom" to Olabode.

(Pet. 6; Vetri Decl., Pet.'s Reply Ex. B, ECF 383.)

Vetri asserts Perri never advised nor prepared him to provide this purportedly

important testimony.  (Vetri Decl.)  In fact, according to Vetri, Perri "scared" him out of

testifying on the last day of trial.  (Vetri Decl.)

Vetri had an opportunity to testify about all these things.  He—and he alone—

chose not to.  A criminal defendant's right to testify at his trial is personal and only he

---

Resp. to Gov't's Sur-Reply 2, ECF 385.)  That case speaks to a criminal defendant's burden of proving
withdrawal from a conspiracy and does not categorically require he testify on his own behalf.

can waive it.  *United States v. Pennycooke*, 65 F.3d 9, 10–11 (3d Cir. 1995).  Vetri did

just that.  In fact, Vetri and Perri engaged in a thorough colloquy regarding this

decision:

> Q: All right.  You understand that we are at a point in your trial where the
>
> government has rested?
>
> A: Yes.
>
> Q: And you had—now have a decision to make as to whether or not you wish to
> testify on your own behalf before this court?
>
> A: Yes.
>
> Q: Have you made a decision as to whether or not you want to testify in this
> case?
>
> A: Yes, I have.
>
> Q: And what is your decision?
>
> A: I would not like to testify.
>
> Q: Is that decision being made of your own free will?
>
> A: Yes, it is.
>
> Q: Have—any force, threats, or promises made to you to make that decision?
>
> A: No.
>
> Q: Is that decision yours alone?
>
> A: Yes, it is.

(Trial Tr. Day 6 at 171:6–172:TK, ECF 206.)

Vetri knowingly, voluntarily and intelligently chose not to testify.  *See*

*Schneckloth v. Bustamonte*, 412 U.S. 218, 241 (1973).  He is not entitled to relief

because he regrets a decision that was his alone to make and that he made with eyes

wide open.  That Vetri contends his testimony would have poked holes in the Government's abundant incriminating evidence is as irrelevant as it is speculative. (Pet. 6; Vetri Decl.)  As Vetri stated on the record, he personally decided on his own not to present this testimony.  The only person Vetri can blame for him not taking the stand is himself.  To the extent Vetri relied on Perri's advice in choosing not to testify, this was a reasonable recommendation given the damaging cross examination he likely would have faced.  *See Strickland*, 466 U.S. at 687–88, 690.

B

Vetri alleges in claim two that Scuderi's simultaneous representation of him and two Government witnesses—Perone and Eric Hastings—created an actual conflict. (Pet. 7–8.)  In claim three, Vetri contends Perri was ineffective for allowing Scuderi to represent Vetri given this conflict.  (*Id.* at 9–10.)  Both Hastings and Perone testified against Vetri.  Hastings said Vandergrift told him he killed Olabode for Vetri.  (Trial Tr. Day 5 at 276:18–277:4.)  Perone stated Vetri received Oxycodone pills from Patel, regularly dealt them to Perone and he redistributed them.  (Trial Tr. Day 3 at 226:24– 231:10, 238:14–20.)

At the hearing on these claims, the Government called Fortunato Perri and Peter Scuderi, and Anthony Vetri testified on his own behalf.

1

i

Perri's credible testimony detailed his responsibilities as lead trial counsel, Scuderi's role in Vetri's defense and Vetri's knowledge of Scuderi's conflict.

12

Perri testified that Scuderi brought him into the case.  (Nov. 1, 2022 Hr'g Tr. 11:8; ECF 422.)  Up and until Scuderi's withdrawal, both lawyers worked together on pretrial matters.  (*Id*. at 12:7–13.)  While they jointly discussed which filings to make, Perri took the lead, had the final say, and was solely responsible for reviewing, submitting and arguing pretrial motions. (*Id*. at 14:4–9; 29:23–30:2.)  He also made it clear that, even though Scuderi was involved with the defense for roughly a month, his withdrawal from the representation made no difference to Perri's strategy, as he had always intended to "carry the load" on the case.  (*Id*. at 33:21–23, 27:17–20.)

Contrary to Vetri's version of his story, Vetri knew of Scuderi's representation of Hastings and Perone; Perri learned about it from both Vetri and Scuderi after he was retained.  (*Id*. at 13:6–14, 29:2–5.)  Also contrary to Vetri's telling, Perri testified he met personally with his client "plenty of times," including on weekends.  (*Id*. at 20:1–16.)  Perri never heard Scuderi disclose information about Hastings or Perone, and Perri never "pulled punches" or otherwise went easier on Hastings or Perone on account of Scuderi's representation of them, something Perri stated "would never happen."  (*Id*. at 31:22–32:14.)

Vetri claims Scuderi did not want Vetri to plead guilty—he needed Vetri to go to trial so that Hastings could testify against him and, on account of that cooperation, earn a reduced sentence in a related case before Judge Diamond.  (Pet.'s Aug 4, 2022 Mem. pp. 3–4; ECF 399.)  Perri (and Scuderi) both put the lie to that theory.  Perri said that Vetri was never interested in a plea deal and that it was Vetri, not Scuderi or Perri, who pushed for a trial.  (Nov. 1, 2022 Hr'g Tr. 20:17–23.)  Perri and Vetri discussed the consequences of testifying and Perri made clear that, at the end of the

13

day, the final choice was Vetri's.  (*Id.* at 26:6–8, 31:16–21.)  Scuderi was not involved in

trial strategy conversations at any point after his withdrawal.  (*Id.* at 28:5–6.)

ii

Scuderi largely corroborated Perri's testimony, particularly on issues where

Vetri told a different tale. Scuderi confirmed that he brought Perri into the case.  (*Id.* at

38:2–9.)  As he told Vetri before Vetri could even hire him, Scuderi's representation of

Hastings and Perrone was why he needed to bring in Perri—otherwise, Scuderi would

have taken the case himself.  (*Id.* at 64:14–18; 77:6–15.)  Believing Perri's role as lead

trial counsel "cured" Scuderi's conflict, Scuderi planned to enter his appearance for

Vetri and second chair the case.  (*Id.* at 38:18–23.)  Scuderi acknowledged that he did

not enter his appearance sooner because he "thought it would be an issue" and wanted

to work on some of the motions beforehand.  (*Id.* at 45:13–17.)  Scuderi corroborated

Perri's description of their respective roles, stating he would prepare initial drafts of

pretrial motions and send them to Perri for review, editing, filing and arguing to the

Court.  (*Id.* at 39:22–40:6; 79:14–24.)  Scuderi also confirmed that he never divulged

any confidential information from Vetri to Hastings or Perone, nor did he talk to either

of them about any motions filed on Vetri's behalf.  (*Id.* at 80:5–19, 83:12–19.)

Like Perri, Scuderi flatly contradicted Vetri's assertions.  He never, as Vetri

claimed, told Vetri the case was a "slam dunk."  (*Id.* at 66:15–20.)  Scuderi also said he

never urged Vetri to go to trial, and they did not discuss whether or not Vetri should

enter a plea.  (*Id.* at 51:8–12.)  Finally, he was adamant that he told Vetri he

14

represented Hastings and Perone and that Vetri wanted to hire him anyway.[3]  (*Id*. at 77:6–15.)

iii

Vetri's testimony was the polar opposite of credible in all material respects. To begin, he submitted as an exhibit to a brief in support his § 2255 petition a declaration, under penalty of perjury, that was false wherever it really mattered.  (Vetri Decl.)  He compounded that transgression by testifying falsely under oath at the hearing.  Vetri bumped up against counsels' consistent, credible versions of what happened, advanced nonsensical positions and attempted to aggrandize his Declaration.

Vetri claimed in the Declaration that he didn't testify at trial because Perri "scared" him out of doing so.  (Vetri Decl.)  He hewed to this fabrication at the hearing, contending that had Perri not "scared" him, he would have taken the stand and, to the jurors' satisfaction, "explain[ed] away everything."  (Nov. 1, 2022 Hr'g Tr. at 108:21–22.)  Again, this directly contradicts the trial record, where Vetri assured the Court under oath he and he alone, of his own free will and absent any force or threats, decided not to testify.  *See supra* Section III.A.2.

Vetri claimed that he not only didn't know Scuderi represented Hastings, but that he didn't even know Hastings was a witness in the case until the trial started. (*Id*. at 104:18–105:5.)  Unfortunately, the Government confronted Vetri with a copy of an email he sent to Perone weeks before the trial in which Vetri wrote "it was more about you than Hastings."  (*Id*. at 105:6–18.)  Though he took a few cracks at it, Vetri couldn't spin his way out of that one.

---

[3]     This is only relevant to the Court's assessment of Scuderi's credibility and Vetri's lack thereof, not whether Vetri attempted to waive Scuderi's conflict.

Vetri continued to deny that Scuderi disclosed his representations of Hastings from the get-go, claiming Scuderi was "mistaken." (*Id*. at 106:2.)  When pressed on why he would seek alternate counsel if he wasn't aware of a conflict, Vetri claimed, for the first time, that Scuderi couldn't first chair the case because he had "health issues."  (*Id*. at 94:11–14.)  This was a transparently bogus attempt to bolster his story, concocted in light of Scuderi's comment at the outset of his testimony that he was having problems with his eyes and was in fact scheduled to have surgery.  (*Id*. at 54:14–17.)  Hearing this, Vetri came up with the theory that Perri only had to take over because of Scuderi's "health problems," pointing out that Scuderi "just admitted he had eye problems," ostensibly precluding him from "taking on a case this big."  (*Id*. at 106:8–11.)  The problem with Vetri's eleventh hour audible is that he never previously mentioned Scuderi's health, not even in the sworn declaration he submitted before the hearing. *See* (Vetri Decl.).

Viewed alongside his other arguments, Vetri's newfound reliance on the eye problems Scuderi was purportedly suffering from five years ago further undermined the Court's ability to believe anything Vetri said.  In essence, he asked the Court to conclude Scuderi's "eye problems" were significant enough to prevent him from trying the case, but would not have hindered his ability to perform his stated role of (drafting and) filing all pretrial motions, doing "a lot of the legal legwork [and] research." (*Id*. at 95:11–14; Vetri Decl. ¶ 4.)

Vetri also claimed Perri told him the "trial was going in [his] favor" and he would only have to testify if they needed a "Hail Mary." (*Id*. at 101:14–22.)  He said in his Declaration that he was often told by both Perri and Scuderi that "there was no

16

evidence against [him]" and the case was a "home run." (Vetri Decl. ¶ 5.) The Court is hard pressed to believe that Perri, a savvy and experienced criminal defense attorney and trial lawyer, would ever classify the trial as going in Vetri's favor or that Perri or Scuderi would ever say such things. There were many ways to describe the strength of the Government's case and the ebb and flow of Vetri's trial. "Going in his favor," "no evidence against him" or "home run" were never any of them, and it is patently absurd for Vetri to say otherwise. *See, e.g.*, (May 30, 2018 Memorandum Opinion Sections I and III.A; ECF 251).

2

Scuderi withdrew his appearance once his conflict was addressed with the Court. Neither Vetri nor Perri objected to the withdrawal. Because the Government conceded Scuderi's representation of Hastings and Perone was an actual conflict, Vetri need only prove his counsel's performance adversely affected his defense. (Gov.'s Prop. FF & CL p. 9, ECF 424); *Strickland*, 466 U.S. at 692. To prove a lapse in representation, Vetri must show an action counsel took or failed to take, or an alternative strategy they failed to pursue.

In an attempt to meet this burden, Vetri proffers four theories, all grounded in how, because he was purportedly compromised by his representation of Hastings and Perone, Scuderi acted in ways inimical to Vetri's interests: 1) The pretrial motion to sever Vetri's case from Vandergrift and Patel's failed to address critical facts known to Scuderi; 2) a motion to suppress evidence failed to argue particularity; 3) Scuderi delayed Hastings's sentencing in a related matter before another judge so that he could testify against Vetri (after Scuderi allegedly made sure Vetri went to trial) and get a

reduced sentence for substantially assisting the Government; and 4) Scuderi told Hastings confidential information learned during his representation of Vetri that would help prepare Hastings for his cross examination at Vetri's trial.  (Pet.'s Prop. FF & CL 13 ¶ 15, 18 ¶ 32, 15 ¶ 20; Pet.'s Reply 12.)  The evidentiary hearing undermined all four arguments and showed conclusively that nothing Scuderi and Perri did or didn't do adversely affected Vetri's defense.

Most of Vetri's effort is centered around his first two theories.  He claims Scuderi's conflict negatively impacted the preparation of two pretrial motions: the motion to sever Vetri's case from codefendants Vandergrift (who was tried and convicted alongside Vetri) and Patel (who pleaded guilty before trial), and the motion to suppress evidence, including his cell phones and their contents, seized in a June 2013 search of his home.  (ECF 107, 109, 117.)

While Scuderi may have prepared the initial drafts, Perri himself handled all aspects of these motions.  He edited or finalized them where necessary, filed them and argued them before the Court.  (ECF 107, 109, 117, 147; Nov. 1, 2022 Hr'g Tr. 30:1–2.)

And in any event, the motions were not deficient in the manner Vetri claims.  In fact, Perri made the precise arguments Vetri claims he did not.  Vetri asserts the motion to sever did not address "several critical facts," mainly Hastings's anticipated testimony against Vetri.  (Pet. 8.)  Hastings (though he was not the primary person to do so—that was Michael Mangold) did incriminate Vetri on the murder charge, stating Vandergrift told him he murdered Olabode for Vetri.  (Trial Tr. Day 5 at 276:18–277:4.) But the motion and its supplement, albeit without naming Hastings, addressed the possibility that statements made by co-conspirators, admissible against Vandergrift,

could be used against Vetri.  Specifically, Perri argued the Government's case against Vetri was going to be "largely testimonial, especially in regard to" Olabode's murder.  (Def. Mot. Sever ¶ 4; ECF 107.)  He was particularly concerned that "the government will try to prove its case circumstantially and with co-conspirator's statements or statements which are only admissible against co-defendant Vandergrift."  (*Id.*)  This is the very essence of the argument Vetri says he wanted his lawyers to make.  After all of the briefing and oral argument, the Court denied Vetri's motion because the law and facts supported that conclusion—not due to any shortcomings in Perri's advocacy.  (Nov. 9, 2017 Mem. 12–15, ECF 140.)

Vetri contends the motion to suppress did not argue that the search warrant for his cell phones lacked particularity.  (Pet. 8.)  He claims this warrant was used to obtain a "highly prejudicial" video introduced at trial.  (*Id.*)  In the video, Vetri asks his toddler daughter, "What did the gangsters do to Bo?" and she responds, "boom, boom, boom."  (Gov't Ex. 603G.)

Perri pressed the particularity point in his motion.  He argued the "items to be seized" section of the warrant was overbroad, boilerplate, "describes every possible document and electronic device ever created" and contained a "general averment" regarding items that "could conceivably be interpreted to be evidence" related to drug offenses.  (Mot. to Suppress 6, ¶ 10.)

More importantly, the parties submitted supplemental briefing and the Court held an evidentiary hearing on the specific issue of whether the search of Vetri's cell phone was too broad.  (Nov. 8, 2017 Order, ECF 137.)  Perri ably argued this issue in his submission, providing a detailed explanation of the case law governing cell phone

searches.  (Mot. to Suppress Supp. Memo. of Law 6–13, ECF 147).  At the hearing, Perri cross-examined FBI Special Agent Matthew Yaeger, who searched the information on the items recovered from Vetri's home, including his cell phones.  (Nov. 15, 2017 Evid. Hr'g Tr. 45:12–53:11, ECF 174.)  Perri argued there was no probable cause to search Vetri's phones.  (*Id.* at 61:7–70:15.)  Perri specifically identified the video of Vetri and his daughter as an item he sought to suppress.  (*Id.* at 4:10–5:5).  Again, the Court subsequently denied Vetri's suppression motion in spite of—not because of—Perri's advocacy.  (Nov. 22, 2017 Mem., ECF 175.)

Vetri's third theory, that Scuderi convinced another judge to continue Hastings's sentencing so that Hastings could testify against Vetri and then gain the benefit of a reduced sentence under U.S.S.G. § 5K1.1 is similarly full of holes.  Vetri wants the Court to believe that Scuderi and Scuderi alone convinced Judge Diamond to delay the sentencing, encouraged Vetri to go to trial (because the case was a "slam dunk" and "home run" for Vetri), and sabotaged the motion to sever to make sure Hastings's statements about what Vandergrift told him would be admissible against Vetri.  This Machiavellian theory is as silly as it sounds.

Vetri put forth no evidence to show what role, if any, Scuderi played in the continuance of Hastings's sentencing hearing.  Scuderi assumed he filed a sentencing memo in that case (because he does so in every case) but had no recollection of whether or not Judge Diamond was going to grant his client a departure under § 5K1.1. (Nov 1, 2022 Hr'g Tr. at 52:8–14.)  In any event, Hastings ended up testifying before being sentenced in his case—and the jury heard all about it.  Perri cross-examined Hastings

on how the delay of his sentencing related to his testimony.  (Trial Tr. Day 5 296:15–297:14).

Neither Scuderi nor Perri encouraged Vetri to go to trial—Vetri was the one pushing for that. Scuderi never told Vetri the case was a "slam dunk" (Nov. 1, 2022 Hr'g Tr. at 66:15–20) and, again, the severance motion, capably argued by Perri, raised the points Vetri says should have been raised. *Compare* (Def. Mot. Sever ¶ 4) *with* (Pet.'s Prop. FF & CL pp. 13–14 ¶¶ 14–16.)  Scuderi said he never urged Vetri to go to trial and Perri was adamant that Vetri was the one who "push[ed] for" it.  (Nov. 1, 2022 Hr'g Tr. at 51:11–12; 20:22–23).  Vetri's delusional belief that he could have "explain[ed] everything away" on the stand, coupled with his lawyers' credible testimony that he wasn't interested in a plea deal makes it fairly obvious that Scuderi did not persuade Vetri to go to trial—something that in and of itself tanks Vetri's claim.

Vetri's last theory assumes, again contrary to his lawyers' credible testimony and without a shred of evidence otherwise, that Scuderi gave Hastings confidential information to help him prepare for his cross-examination by Perri.  Vetri doesn't even suggest what specifically was revealed.  Scuderi denied telling Hastings or Perone anything he knew about Vetri and Perri said Scuderi never divulged information about his other clients or asked Perri to "pull punches" on his cross examinations, something Perri credibly testified would never happen.  (*Id.* at 32:6–14.)  Perri went at Hastings and Perone with whatever he had, something the trial record bears out.  *See* (Trial Tr. Day 5 294:18–297:14 (Perri's cross of Hastings); Trial Tr. Day 3 259:12–263:21 (Perri's cross of Perone)).

21

Beyond his main arguments, Vetri's post-hearing briefing is peppered with other allegations challenging Perri's effectiveness under claim three.  He argues that including the statute of limitations defense in a motion to dismiss was improper and prematurely revealed defense strategy to the Government.  Perri's tactical choices are owed wide latitude and deference.  *See Strickland*, 466 U.S. at 689–91.  Further, he effectively argued the point throughout the trial.  *See supra*, Section III.A.1.  A statute of limitations defense is hardly the type of argument that materially benefits from prolonged secrecy.  Vetri has failed to show that the manner in which Perri chose to raise it adversely affected his representation.

Vetri's claim that Perri ineffectively failed to file a "*Brady/Giglio* motion" is without merit.  *See* (Pet.'s FF & CL p. 8 ¶ 37).  Perri correctly acknowledged that the Government is obligated to disclose such information regardless of any motions filed by a defendant.  (Nov. 1, 2022 Hr'g Tr. 30:21–31:4).  Because Vetri hasn't shown a *Brady* violation, as discussed in Section III.F, *supra*, Perri's failure to file a motion had no effect on his defense.

The post-hearing briefing also argues, redundantly, that Perri's reliance on cross examination of the Government's witnesses to show Vetri withdrew from the conspiracy constitutes ineffective assistance. (Pet.'s FF & CL p. 21 ¶ 40.)  Vetri admits he was aware that evidence of withdrawal from the conspiracy would be raised on cross, and the law imposes no categorical rule that a defendant must testify to establish it.  (Vetri Decl. 2); *see supra*, note 2.  For the reasons discussed in Section III.A.1, *supra*, this argument is unavailing.

Because Vetri failed to prove that either Scuderi or Perri's representation adversely affected his defense, claims two and three are denied.

C

Vetri asserts in claim four that Perri was ineffective for not moving to exclude a laundry list of purportedly irrelevant evidence, including about a "Florida drug conspiracy," Vetri's Oxycodone distribution as described by witness Louis Santoleri and certain instances of Patel's drug dealing.  (Pet. 11.)  Attempting to bar this evidence's admission would have been a fruitless deviation from Perri's defense strategy that, even if successful, is extremely unlikely to have changed the jury's verdict.  *See Strickland*, 466 U.S. at 687.

Perri's decision to not move to exclude this evidence is presumptively reasonable and, given that Vetri can't show otherwise, effectively unchallengeable.  *See Strickland*, 466 U.S. at 689–91.  Perri reasonably focused on trying to demonstrate Vetri withdrew from the conspiracy before the limitations period.  *See Jacobs v. Horn*, 395 F.3d 92, 102 (3d Cir. 2005).

Vetri misunderstands relevance in the context of his trial.  The question was whether the Government's evidence had a tendency to make a fact consequential to the conspiracy or murder charges more or less probable, not how the evidence related to Vetri's alleged withdrawal from the conspiracy and statute of limitations defense.  *See* (Pet.11); Fed. R. Evid. 401.  In any event, failing to file meritless motions does not constitute deficient performance, and it would have been futile for Perri to move to exclude the relevant evidence Vetri invokes in his claim.  *See Werts v. Vaughn*, 228 F.3d 178, 203 (3d Cir. 2000).

For example, much of this evidence helped establish Vetri's role in the conspiracy. The Government needed to show a unity of purpose among the conspirators, including Vetri, intent to accomplish a common goal and an agreement to work together toward it. *United States v. Garner*, 915 F.3d 167, 170 (3d Cir. 2019). As the Court previously explained, Vetri and his coconspirators shared the broad general goal of making money by illegally selling Oxycodone. *See* (May 30, 2018 Mem. 23–24). To achieve this objective, they travelled to Florida to purchase pills, among much other illegal activity—including Vetri's and Patel's Oxycodone distribution between themselves and with others. *See* (*id.*).[4] This conduct helped ensure the scheme's success. *See United States v. Kelly*, 892 F.2d 255, 259 (3d Cir. 1989) (describing features distinguishing one from multiple conspiracies). Finally, the probative value of the evidence Vetri identifies was not substantially outweighed by the danger of unfair prejudice. *See* Fed. R. Evid. 403.

## D

In claims five, seven and eight, Vetri contends Perri was ineffective in several respects for failing to counter the Government's murder case. (Pet. 16.) Vetri alleges nothing to rebut the strong presumption that Perri's defense strategy was reasonable. *See Strickland*, 466 U.S. at 689–91.

Vetri claims he lacked a motive to have Olabode killed. (Pet. 16, 18.) But the Government presented extensive evidence allowing the jury to find that Vetri needed Olabode out of the way. When Oxycodone wholesalers cut back their distributions to Patel, Vetri and Olabode became competitors for a reduced supply. Patel chose Olabode

---

[4]     The Court declines Vetri's request to "reconsider" its post-trial ruling on this issue, which accorded with the relevant law and facts. (Pet.'s Reply 21–24, ECF 382.)

as his preferred distributor.  Eliminating Olabode would give Vetri a larger portion of a limited number of pills.  That Patel had other distributors is irrelevant; Vetri knew killing Patel's primary distributor, Olabode, would increase Vetri's pill supply.

Vetri also contends others had motives to kill Olabode.  (*Id.* at 18–19.)  Focusing on these half-baked alternative motives, however, would have been useless and likely counterproductive to Perri's defense strategy.  The Government presented ample evidence of Vetri's involvement in Olabode's murder, including detailed testimony from several witnesses.  *See, e.g.*, (Trial Tr. Day 5 at 67:2–10 (Michael Mangold, one of the two shooters, said Vandergrift told him murdering Olabode would allow Vetri to obtain more Oxycodone from Patel)); (Trial Tr. Day 5 at 276:18–277:4 (Hastings said Vandergrift told him he murdered Olabode for Vetri)); *see also* (Apr. 23, 2020 Op. 7 (Third Circuit describing pertinent testimony in affirming conviction), Dkt. 18-2372, ECF 135.  It was reasonable for Perri to decide not to confuse the jury with undeveloped theories unlikely to create reasonable doubt about Vetri's guilt.  *See Strickland*, 466 U.S. at 689–91.

Vetri focuses on the possibility that Nicholas Della Polla or witness John Gordon could have ordered Olabode's murder.  (Pet.'s Reply 14–18.)  But this theory rehashes an argument the Court twice rejected, and Vetri's own description of the theory exposes its flimsiness.  (Nov. 2, 2021 Order, ECF 361; July 14, 2022 Order n.1, ECF 391.)

Vetri vaguely asserts Della Polla and Gordon were "active members" in the charged Oxycodone conspiracy who had a "clear motive and ample opportunity" to orchestrate Olabode's murder so they could receive more pills at cheaper prices from Patel directly.  (Pet.'s Reply 15.)  Vetri further speculates that, because of various

unsubstantiated circumstantial evidence, it is "not a leap of faith to believe that [Della Polla] would want Bo out of the way." (*Id.*)

Vetri also alludes to a fall 2011 burglary of Gordon's home committed by Vandergrift, Mangold and witness Allen Carter in which they obtained the firearm Mangold used to shoot Olabode. (*Id.*) According to Vetri, several ambiguous circumstances show the burglary was an "inside job." (*Id.* at 16.) Vetri asks the Court to play crime scene detective and analyze the valuables and pets found at the burgled residence for clues that support his theory. (*Id.* at 16.) It will not do so.

In addition, Vetri points to other allegedly "compelling facts" that purportedly link Gordon and Della Polla to Olabode's murder, including Gordon's grand jury testimony that "he believed" Della Polla had "something to do with" the burglary and murder. (*Id.* at 16–17.) Perri reasonably concluded this "theory of third-party culpability" was not worth presenting to the jury. (*Id.* at 17.)

E

Vetri asserts in claim six that Perri was ineffective for not seeking a continuance to further discuss Vetri's case with him, including discovery materials the Government turned over pursuant to the Jencks Act. (Pet. 17.) The Court resolved this issue before and after trial.

In a letter to the Court before trial and again at the final pretrial conference, Perri said Vetri wanted Perri to ask the Court to postpone trial so Vetri could have more time to review discovery materials. (ECF 247 Ex. 1; Final Pretrial Conf. Tr. 25:6–16, ECF 209.) Perri, however, twice stated he was ready for trial and specifically noted at the final pretrial conference that he sufficiently reviewed discovery materials. (*Id.*)

Given Perri's assurances, Vetri did not formally seek a continuance. To the extent he requested a delay, the Court denied it because Vetri and his lawyer had adequate time to prepare for trial. (Final Pretrial Conf. Tr. 29:3–30:19.) Additionally, in denying Vetri's posttrial motion for acquittal, the Court reiterated that a continuance would not have been appropriate. (May 30, 2018 Mem. 16–17.) Vetri alleges nothing new to change these conclusions.

Indeed, Perri's performance at trial confirms he needed no additional time to prepare. He was well-versed in the voluminous evidence and effectively attempted to rebut the Government's case through cross examination and in his opening statement and closing argument.

F

Vetri alleges in claim nine that the Government violated the Supreme Court's decision in *Brady v. Maryland*, 373 U.S. 83 (1963) or the Jencks Act by not disclosing an alleged prior statement from Gordon that Della Polla "set up" the burglary of his home and Olabode's murder. (Pet. 19).

Again, the Court already resolved this issue. *See supra* Section III.D. It twice found this murder theory did not even constitute good cause to obtain discovery from the Government, let alone a viable defense at trial. *See* (Nov. 2, 2021 Order n.1, ECF 361); (July 14 2022 Order n.1, ECF 388).

In any event, to prove a due process violation under *Brady*, a criminal defendant must show the Government suppressed evidence favorable to the defense and material to guilt. *United States v. Schneider*, 801 F.3d 186, 202 (3d Cir. 2015). Vetri cannot show suppression because he knew of "essential facts" allowing him to take advantage

of exculpatory evidence. *See United States v. Perdomo*, 929 F.2d 967, 973 (3d Cir. 1991). The Government disclosed Gordon's grand jury transcript and included it on its trial exhibit list. (ECF 152 at 16 (Gov't Ex. 903).) Nor was Gordon's statement material—that is, there was not a reasonable probability that, were it disclosed to the defense, the proceeding's result would have been different. *United States v. Bagley*, 473 U.S. 667, 682 (1985). The volume of evidence implicating Vetri in Olabode's murder precludes him making this showing. Relatedly, he cannot show the prejudice needed to obtain relief under the Jencks Act, which requires the Government to disclose witness statements related to the subject matter of the witness's testimony. *See* 18 U.S.C. § 3500(b); *United States v. Hill*, 976 F.2d 132, 141 (3d Cir. 1992).[5]

G

Vetri alleges in claim ten that Perri was ineffective for inadequately impeaching Mangold and not objecting to evidence about Vetri ordering the burglary of Gordon's home. (Pet. 19–20.) Neither allegation merits relief.

Vetri contends Perri should have cross-examined Mangold about his proffered statement to the Government that as far as he knew, Vetri did not "set-up" the burglary. (Pet.'s Reply 18–19; Pet.'s Reply Ex. H 13.) Vetri cannot show Perri's decision not to cross-examine Mangold with this prior statement was prejudicial. *See Strickland*, 466 U.S. at 694.

---

[5]     In his Reply to the Government's Response, Vetri attempts to amend his claim to assert ineffective assistance of counsel arising out of Perri's failure to obtain and use Gordon's statement at trial. (ECF 382 at 14–18.) Even if the Court assumes Perri could have obtained the statement, presenting it to the jury would have amounted to a meaningless detour from his defense strategy on the murder count. The evidence implicating Vetri was more than sufficient to support the jury's verdict, and the Court declines to entertain his unrealistic speculation that introducing Gordon's statement could have led to a different result. *See Strickland*, 466 U.S. at 689; *supra* Section III.D.

Perri ably impeached Mangold about myriad issues, namely his prior lies to federal agents during proffer sessions, lack of compensation for murdering Olabode and motive to testify against Vetri pursuant to his cooperation with the Government.  (Trial Tr. Day 5 at 110:8–120:15.)  Perri's cross-examination of Mangold was detailed, incisive and, most important, objectively reasonable.  *See Strickland*, 466 U.S. at 687–88.  While Perri didn't introduce Mangold's proffered statement, the Court must be highly deferential to his strategic decisions and resist the temptation to second-guess them in hindsight. *See United States v. Gray*, 878 F.2d 702, 711 (3d Cir. 1989); *Strickland*, 466 U.S. at 689.  Moreover, it is extremely unlikely Perri's decision not to present the statement affected the jury's verdict on the murder count given the volume of evidence the Government presented, including of Vetri's advance knowledge that a gun would be used.  *See Strickland*, 466 U.S. at 694; (May 30, 2018 Mem. 9–11).[6]

As for Vetri's allegation regarding Perri's failure to object to evidence about Vetri's role in the burglary, the Court must be highly deferential to Perri's decisions about whether to raise objections.  *See Strickland*, 466 U.S. at 689–90.  Objecting here would have been a pointless attempt to relitigate an issue the Court previously decided.  Specifically, the Court granted the Government's pretrial motion for admission of the burglary evidence after considering both Vetri's and Vandergrift's responses and holding oral argument.  (Nov. 22, 2017 Mem. 7–8, ECF 171.)  The Court's rulings that this evidence was intrinsic to the murder charge and that its probative value was not

---

[6]     Vetri also improperly alleges for the first time in his Response to the Government's Sur-Reply that Mangold proffered to the Government that Vetri was not involved in Olabode's murder.  (ECF 385 4–5); *see Gucciardi v. Bonide Prods., Inc.*, 28 F. Supp. 3d 383, 393 (E.D. Pa. 2014).  Vetri provides no support for this allegation and, even if true, it would not change the Court's conclusion on this claim.

substantially outweighed by the danger of unfair prejudice were well supported by the law and facts.

H

Vetri alleges in claim eleven that the Government violated the Supreme Court's decisions in *Brady* and *Napue v. Illinois*, 360 U.S. 264 (1959) and the Third Circuit's decision in *Haskell v. Superintendent Greene, SCI*, 866 F.3d 139 (3d Cir. 2017) by not disclosing certain insurance records or correcting Patel's allegedly false related testimony. (Pet. 20.) In the alternative, Vetri contends Perri was ineffective for not obtaining and introducing these records to cross-examine Patel. (*Id.*) One of the Court's prior decisions again forecloses Vetri's claim.

The Court ruled against Vetri when he raised this issue in a *Brady* claim in his post-trial motion for acquittal. (ECF 196 at 31); (Supp. Mot. for Acquittal 4.) Then as now, Vetri cannot show any evidence suppressed by the Government or that it would have been material. *See* (May 30, 2018 Mem. 17–19); *Perdomo*, 929 F.2d at 973; *Bagley*, 473 U.S. at 682. Vetri similarly cannot demonstrate prejudice for his ineffectiveness claim, and his allegation of deficient performance also fails because Perri effectively cross-examined Patel about his insurance fraud. (Trial Tr. Day 4 at 185:7–187:7); *Strickland*, 466 U.S. at 687.

Both *Napue* and *Haskell* involve the prosecution's knowing use of false testimony. Vetri contends without support that this occurred when the Government presented Patel's allegedly erroneous testimony. The Government violates due process when it knowingly presents or fails to correct false testimony in a criminal trial. *Haskell*, 866 F.3d at 145–46. A conviction obtained by the knowing use of perjured

30

testimony must be vacated if there is a reasonable likelihood the testimony could have affected the jury's judgment. *United States v. Augurs*, 427 U.S. 97, 103 (1976). Vetri alleges nothing to suggest the Government knew or should have known Patel testified falsely, and it is exceedingly unlikely such testimony could have influenced the jury's guilty verdict.

### I

Vetri asserts in claim twelve that the Government violated *Haskell* when it allowed Hastings to purportedly testify falsely about Vetri's role in Olabode's murder. (Pet. 21.) In the alternative, he contends Perri was ineffective for failing to object to this testimony based on a Sixth Amendment violation under *Massiah v. United States*, 377 U.S. 201 (1964) and inadequately impeaching him on it. (*Id.*) The trial record refutes Vetri's claim.

Although Vetri now alleges otherwise, Hastings testified that in October of 2014 he was taken into federal custody on drug charges and placed in a holding cell with Vandergrift. (Trial Tr. Day 5 at 267:3–268:6.) Vandergrift told Hastings he murdered Olabode in an effort to obtain Oxycodone from a pharmacist. (*Id.* at 269:13–270:6.) According to Hastings, he and Vandergrift later were cellmates at the Federal Detention Center in Philadelphia for roughly two and a half months. (*Id.* at 273:3–15.) This testimony was supported by FDC inmate living history records explained by Yaeger. (Gov't Exs. 904C, D, E); (Trial Tr. Day 6 at 157–163.)

Additionally, Hastings said the Government never instructed him to speak with Vandergrift while the two were cellmates. (Trial Tr. Day 5 at 274:4–9.) Consequently, there was no basis for Perri to raise a *Massiah* objection. *See Werts*, 228 F.3d at 203.

To obtain relief under *Massiah*, the claimant must show (1) the right to counsel attached when the alleged violation occurred, (2) an informant was acting as a "government agent" and (3) the informant engaged in "deliberate elicitation" of incriminating information "from the defendant." *Matteo v. Superintendent, SCI Albion*, 171 F.3d 877, 892 (3d Cir. 1999). As an initial matter, Vetri lacked standing to raise a *Massiah* claim, given the statements at issue were Vandergrift's, not his. *See Massiah*, 377 U.S. at 207. Even if Vetri had standing, he could not show Hastings was acting as a government agent or deliberately elicited incriminating information. *See Matteo*, 171 F.3d at 892.

Nonetheless, Vandergrift told Hastings when, where and how the murder occurred, from where the murder weapons were obtained, who he committed the murder with and that he did so for Vetri. (Trial Tr. Day 5 at 274:18–277:2.) Vandergrift further explained Vetri wanted to eliminate Olabode to increase his Oxycodone supply from "the Indian guy"—namely, Patel—and that Vandergrift and Vetri discussed the murder after it occurred. (*Id.* at 277:23–280:8.)

Vetri cannot demonstrate a *Haskell* violation given the Court previously rejected his "wild" and "inflammatory" allegations that the Government induced perjured testimony from Hastings. (May 30, 2018 Mem. 21.) Moreover, Perri reasonably objected to the admission of Hastings's statements against Vetri (not on *Massiah* grounds). *See Strickland*, 466 U.S. at 689. But the Court overruled the objection, concluding his testimony was admissible as statements against interest as to Vetri, after considering pretrial briefing and argument at sidebar. (Trial Tr. Day 5 at 144:25–

146:19.)  The Third Circuit subsequently affirmed this ruling.  (Apr. 23, 2020 Op. 9,
Dkt. 18-2372, ECF 135.)

J

Vetri asserts in claim thirteen that Perri was ineffective for inadequately cross-
examining Maratea about his motive for testifying against Vetri.  (Pet. 22.)  Vetri's
claim is unsupported by the record and can't satisfy the "highly demanding" standard to
show a Sixth Amendment violation.  *Kimmelman v. Morrison*, 477 U.S. 365, 382 (1986).

Perri's tactical choices, such as which questions to ask on cross examination,
are owed wide latitude and a high degree of deference.  *See Strickland*, 466 U.S. at 689–
91.  Perri cross examined Maratea on a number of issues, including Vetri admitting to
him that he ordered Olabode's murder, and Maratea's initial non-disclosure of these
statements to federal officers, prior criminal activity—including mortgage and
insurance fraud—potential punishment, violation of his plea agreement with the
Government and incentive to testify as part of his cooperation.  (Trial Tr. Day 5 at
231:10–239:14.)  Perri reasonably concluded other topics were not worth pursuing,
likely because of the possibility of opening the door to damaging recross.  (Gov't's Sur-
Reply ¶ 5, ECF 379.)  The Court will not indulge Vetri's request to Monday morning
quarterback Perri's impeachment of Maratea's testimony.  *United States v. Sepling*, 944
F.3d 138, 151 (3d Cir. 2019).

K

Vetri asserts in claim fourteen that Perri was ineffective for failing to call
character witnesses for Vetri.  (Pet. 22.)  The law and facts establish otherwise.

33

While a criminal defendant may offer reputation or opinion testimony about his good character, the prosecutor can offer evidence to rebut it.  Fed. R. Evid. 404(2)(A), 405(a).  Good character testimony is "minimally probative" and often opens the door to extremely damaging contrary evidence.  *See United States v. Gonzalez*, 905 F.3d 165, 204–05 (3d Cir. 2018); *United States v. Pujana-Mena*, 949 F.2d 24, 30 (2d Cir. 1991).  That principle applies even when, as here, the criminal defendant claims to have many friends or relatives who would have testified for him.  (Pet.'s Reply Ex. D, ECF 383.)

Dr. Angela Seracini, a first cousin of Vetri's father, would have said she does not believe Vetri "would be capable of being involved in anyone's murder in any way." Joseph Mangeluzi, Vetri's cousin, would have stated Vetri is "incapable of being involved in a murder."  Merrill Jay Mirman, a friend of Vetri's father, would have opined he is "surprised that [Vetri] was involved in an alleged murder" and that he is a "peaceful person."  Adam Powell, Vetri's "best friend[]" who is "like" his brother,  would have told the jury he doesn't think Vetri "would ever consider hurting another person or having somebody hurt another person for him," that "never in a million years" would Powell "believe, think, or even suspect slightly that [Vetri] is or was or ever would be the kind of person that would even consider doing something like that" and that there is "no way that this is possible and [Vetri is] responsible for a killing."  Finally, George Cipolloni Jr., another first cousin of Vetri's father, would have added that "from the bottom of my heart" he was "shocked" to learn of Vetri's involvement in Olabode's murder and does not believe Vetri "had anything to do" with it because "he is just not like that."

This testimony almost certainly would have hurt Vetri's defense more than it helped, given the ample rebuttal evidence at the Government's disposal. *See* (Gov't's Resp. 30–31, ECF 373). For example, the Government had evidence, which the Court ruled inadmissible before trial, that in the fall of 2011 Vetri directed Vandergrift and Mangold to burglarize Santoleri's home, which Vetri knew contained a firearm. (Nov. 22, 2017 Op. 11–12.) This would have corroborated the admitted evidence of Vetri's involvement in the burglary of Gordon's home committed by Vandergrift, Mangold and Carter around the same time, through which they obtained the weapon Mangold used to shoot Olabode. *See supra* Section III.D. The Government could have used this and other evidence to prolong the "drumbeat of negativity" of which Vetri now complains. (Pet. 22.) Perri made a sound strategic decision not to present testimony of Vetri's purportedly good character. *See Dunn*, 141 S.Ct. at 2410.

L

In claim fifteen, Vetri alleges his investigator discovered that in late 2018 Yaeger took Mangold into custody and since then Mangold has "seemingly 'fallen from the face of the earth.'" (Pet. Supp. ¶ 2, ECF 378.) According to Vetri, this "suggests that there may have been a secret deal" between Mangold and the Government that the latter failed to disclose to Vetri before trial, thereby violating *Brady*. (*Id.* at ¶ 3.)

The Court declines Vetri's request to speculate that a purported deal existed. *See Simon*, 929 F.3d at 128 n.7. Even if it did, Vetri cannot demonstrate it was material. *See Bagley*, 473 U.S. at 682. The Government presented copious

testamentary and documentary evidence of Vetri's guilt that was more than sufficient to support the jury's verdict.[7]

IV

A § 2255 petitioner can appeal the denial of his claims only if he obtains a certificate of appealability.  28 U.S.C. § 2253(c)(1).  A district court cannot issue one unless the petitioner makes a substantial showing that his constitutional rights were denied.  § 2253(c)(2).  To do so, he must demonstrate reasonable jurists would find the court's evaluation of his constitutional claims wrong or debatable.  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  A certificate of appealability is not warranted here because reasonable jurists would not debate the Court's ruling, and Vetri has not made a substantial showing that his constitutional rights were violated.

An appropriate order follows.

BY THE COURT:


***/s/ Gerald J. Pappert***
GERALD J. PAPPERT, J.

---

[7]     Vetri argues in claim sixteen that the cumulative effect of Perri's errors prejudiced him. (Pet. 22; Pet. Supp. ¶ 7.)  The Court's rulings on Vetri's individual claims forecloses this argument.